FILED
15-0292
10/26/2015 5:00:42 PM
tex-7546688
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

NO. 15-0292

In the
SUPREME COURT OF TEXAS

TFO REALTY, LLC,
           Petitioner,

V.

PHILIP S. SMITH
           Respondent.

RESPONDENT'S BRIEF ON THE MERITS

Clint Schumacher
 Texas Bar No. 24002914
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8587 – Telephone
(214) 740-8800 – Facsimile
jschumacher@lockelord.com

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................i

STATEMENT OF JURISDICTION....................................................................1

ISSUE PRESENTED..............................................................................................1

STATEMENT OF FACTS......................................................................................1

     A.     The Parties' Contract...................................................................2

     B.     The Sale to The City of Dallas..............................................3

SUMMARY OF THE ARGUMENT....................................................................6

ARGUMENT..........................................................................................................7

     A.     The Plain Language of The Contract.......................................7

     B.     The Sale to The City of Dallas..............................................9

     C.     Submitted to the City of Dallas.............................................18

CONCLUSION......................................................................................................20

CERTIFICATE OF COMPLIANCE..................................................................22

CERTIFICATE OF SERVICE...........................................................................23

i

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Burch v. City of San Antonio,*
    518 S.W.2d 540 (Tex. 1975) ....................................................................9

*Canales v. Laughlin,*
    214 W.W.2d 451 (Tex. 1948).................................................................19

*City of Carrollton v. Singer,*
    232 S.W.3d 790 (Tex. App.—Fort Worth 2007, pet. denied)......................11, 12

*Coker v. Coker,*
    650 S.W.2d 391 (Tex. 1983) ...................................................................7

*Garrison v. City of New York,*
    88 U.S. 196 (1874)................................................................................15

*Kohl v. United States,*
    91 U.S. 367 (1875)................................................................................15

*Lundstrom, Inc. v. Nikkei Concerns, Inc.,*
    758 P.2d 561 (Wash. App. 1988) ............................................................13, 14

*Mealey v. Orlich,*
    585 P.2d 1233 (Ariz. 1978) ...................................................................14

*Preston v. Carnation Co.,*
    Cal. Rptr. 240 (Cal. App. 1961)...............................................................15

*Republic Nat'l Life Ins. Co. v. Spillars,*
    368 S.W.2d 92 (Tex. 1963).....................................................................8

*Sonday v. Dave Kohel Agency, Inc.,*
    718 N.W.2d 631 (Wis. 2006)..................................................................16

*Tyler v. Seiler,*
    136 N.Y.S. 394 (N.Y. Sup. 1912)............................................................15

*Valence Operating Co. v. Dorsett,*
    164 S.W.3d 656 (Tex. 2005) ...........................................................7, 18, 19

*Wilson v. Frederick R. Ross Inv. Co.,*
    180 P.2d 226 (Colo. 1947)...................................................................15

**CONSTITUTION AND STATUTES**

Burke, Law of Real Estate Brokers, 2d ed. §3.3 (1992 & Supp. 2007) ..................16

Dallas City Charter......................................................................................passim

Dallas City Charter Chapter II, Section 1(46) ........................................................9

Dallas City Charter Chapter III, Section 1.......................................................9, 19

Texas Local Government Code §251.001 .............................................................11

TEX. LOC. GOV'T CODE §251.001(a) ...............................................................9, 18

TEX. LOC. GOV'T CODE §273.001 .....................................................................9, 11

Texas Local Government Code sections 251.001(a) and 271.001 ..........................12

Vendor and Purchaser Risk Act (Tex. Prop. Code §5.007)....................................17

## STATEMENT OF JURISDICTION

Jurisdiction in the Supreme Court is not proper. This case involves construction and application of a contract. The pertinent principles of law relied upon by the decision of the trial court and the Dallas Court of Appeals do not conflict with any other opinion in this State and the opinion is neither erroneous nor of significant jurisprudential value to the State of Texas. This case does not warrant this Court's attention.

## ISSUE PRESENTED

Petitioner seeks to transmute this case into a question of whether any real property purchase by a governmental entity is a condemnation. Although the answer to that question is no, this is not the true issue presented by the case. This case involves construction and application of a contract. Both the trial court and the Dallas Court of Appeals correctly analyzed and applied the contract.

## STATEMENT OF FACTS

The material and operative facts are undisputed. Petitioner's statement of facts is accurate.[1] There are some additional facts in the record that further support the trial court's judgment. There are also some factual assertions in the

---

[1] Mr. Smith notes that Petitioner, TFO Realty, included many of the parties' legal arguments in the statement of facts (pages 5-6 of Petitioner's Brief on the Merits). These were, of course, arguments made by the parties and not operative facts. Nonetheless, the contentions as stated by Petitioner appear to be accurate, save one. Petitioner writes that Mr. Smith argued that the "transfer" of the subject property from TFO Realty to the City of Dallas was "in essence as 'sale.'" Mr. Smith contends that the "transfer" was a sale (not essentially a sale). It was negotiated, it was consensual, and it was transferred by deed. It was a sale.

1

Petitioner's "Argument" section with which Respondent Mr. Smith disagrees. Those will be addressed in the following Statement of Facts.

## A.    The Parties' Contract

Petitioner describes the Exclusive Listing Agreement in its Statement of Facts. It can be found in the record at pages 107-112 of the Clerk's Record ("CR") and attached hereto as Appendix 1. The term of the Exclusive Listing Agreement was extended on several occasions. The last extension was dated December 23, 2009, and extended the term of the Exclusive Listing Agreement and the authorizations given to Mr. Smith thereunder through December 31, 2010. The final extension to the Exclusive Listing Agreement can be found at CR 113-114. Paragraph 4 of the Exclusive Listing Agreement provides that, during the term of the Agreement, "all inquiries and offerings received by Owner with respect to the Premises, *regardless of the source of such inquiries or offerings,* and all negotiations shall be conducted solely by Agent or under Agent's direction . . . ." CR 107-108 (emphasis added).

Paragraph 5 of the Exclusive Listing Agreement provides that "[i]n the event that . . . (ii) at any time after the expiration or termination of this agreement a sale of all or any portion of the Premises, upon any terms acceptable to Owner, shall be made with ***any purchaser*** to whom the Premises were submitted by Agent, or by Owner, or by any other person during the term of this agreement; then, and in

2

either such event, Owner agrees to pay Agent one (1) full commission computed and payable in accordance with the applicable annexed Schedule." CR 108 (emphasis added).

The Exclusive Listing Agreement contained a Schedule that provides that the sales commission is to be five percent of the total sales price. The Schedule further provides, in paragraph 2, that the "commission shall be earned, due and paid in full at the time of the closing or transfer of title to the property . . . ." CR 111.

B.    **The Sale to The City of Dallas**

Within the term of the Exclusive Listing Agreement (on April 16, 2010), Mr. Todd Wright, a member of the Real Estate group for the City of Dallas, called Mr. Smith (whose sign was on the Premises) to inquire about the sales price for the Premises. CR 35 (Affidavit of Mr. Smith ¶4). Mr. Smith promptly reported that inquiry to Ms. Owen by email the same day. *Id.*; *see also* CR 122 (Deposition of Todd Wright, p. 12, l. 9 – p. 13, l. 13). Mr. Wright assumed (correctly) that Mr. Smith was a broker for the Premises due to seeing his sign on the Premises. CR 126 (Deposition of Todd Wright, p. 43, l. 25 – p. 44, l. 6); CR 122 (Deposition of Todd Wright p. 12, l. 18 – p. 13, l. 13).

By July 2010, the City of Dallas had decided that it wished to acquire a portion of the Premises for a drainage project. At no time, however, was the use of

3

eminent domain approved to acquire any part of the Premises. Supplemental Clerk's Record ("SCR") 36, 37 (Deposition of Todd Wright, p. 18, l. 14 – p. 22, l. 24). The acquisition by the City was, in their words, "amicable." SCR 36, 37 (Deposition of Todd Wright, p. 20, l. 25 – p. 22, l. 8) and CR 81.

Mr. Wright, on behalf of the City, wrote a letter to TFO Realty on July 27, 2010. CR 63. In the letter, Mr. Wright indicated that the City of Dallas was proceeding with the acquisition of land necessary for a drainage project and that a portion of the Premises "will be needed for the project" (emphasis added). The City indicated that it was going to have the property appraised, surveyed, and inspected by an environmental firm. Through the last part of 2010, the City's due diligence process continued. CR 123 (Deposition of Todd Wright, p. 15, l. 23 – p. 17, l. 13).

When the Exclusive Listing Agreement expired at the end of 2010, Mr. Smith inquired about extending the agreement as they had done over the course of the previous nine years. With the City having expressed its intention to acquire a portion of the Premises and in the midst of its continued due diligence, Ms. Owen now refused to sign another extension. CR 36 (Mr. Smith Affidavit ¶6).

By September 2011, TFO Realty and the City had agreed upon terms for the sale of a portion of the Premises. The transaction was approved by the Dallas City Council on October 26, 2011. CR 88-96 (certified copy of an October 26, 2011

4

Resolution of the Dallas City Council). The sales price was $3,338,680.00. CR 82-87 (certified copy of Warranty Deed). This was a materially higher price than the price initially offered by the City. CR 37. (Deposition of Todd Wright, p. 37, l. 4-20; City's initial offer was "2 million and some-odd dollars"). TFO Realty transferred title to most of "Tract 2" (as described in the Exclusive Listing Agreement) to the City of Dallas by Special Warranty Deed dated November 30, 2011. *Id.* TFO Realty received the negotiated purchase price from the City. CR 51 (Deposition of Todd Wright, p. 30, l. 6 – p. 31, l. 25). This transaction closed at the title company. CR 51 (Deposition of Todd Wright, p. 30, ll. 10-12).

The property that the City of Dallas acquired is a portion of the property that is the subject of the Exclusive Listing Agreement. CR 36 (Mr. Smith's Affidavit ¶7); CR 48 (Deposition of Todd Wright, p. 7, l. 24 – p. 8, l. 18). Nonetheless, despite repeated demands for payment and despite Mr. Smith's many years of effort to market and sell the subject property, TFO Realty refused to pay Mr. Smith the commission due under the Exclusive Listing Agreement. CR 36 (Mr. Smith's Affidavit ¶7).

In its "Argument" section, Petitioner asserts that the summary judgment evidence established that the City of Dallas would have condemned the Petitioner's property if no agreement had been reached. Petitioner's Brief on the Merits, p. 15. This is incorrect. As the section cited by Petitioner shows, if TFO had refused to

sell the property to the City, the City's representative, Mr. Wright, would have had to: (i) confirm with the project engineer that they were willing to use the condemnation power; (ii) "gone through the necessary traps"; and (iii) forwarded the file to the City attorney's office. CR 51 (Deposition of Todd Wright, p. 32, l. 21 - p. 33, l. 10); *see also* SCR 42-43 (Deposition of Todd Wright, p., 45, l. 1 – p. 48, l. 3). None of this happened, because Petitioner agreed (after having the property on the market for 10 years) to voluntarily sell to the City. There is no summary judgment evidence as to what *might* have happened or whether the Dallas City Council would have chosen to exercise the City's condemnation power if Petitioner had not sold.

## SUMMARY OF THE ARGUMENT

The trial court's judgment and the Court of Appeals' opinion enforces the plain language of the parties' contract. The parties' agreement is broadly worded with regard to when a commission is earned. TFO Realty agreed to pay Mr. Smith a commission upon the sale of all or any part of the subject property. TFO Realty agreed to pay a commission if the premises were submitted by Mr. Smith, by itself (TFO Realty), or "by any other person." All inquiries and offerings were to be referred to Mr. Smith "regardless of the source." The City of Dallas acquired the property by deed in an "amicable" transaction. The City Council *__never__* authorized the use of the City's eminent domain power to acquire the subject tract. The

6

subject transaction was a sale and a commission was earned under the plain language of the parties' contract. TFO invites this Court to rewrite the parties' contract, to rewrite the Texas Local Government Code, to rewrite the Dallas City Charter, and to rewrite the City of Dallas Ordinance approving the purchase of this property. The Court should decline TFO's invitation.

## ARGUMENT

### A. The Plain Language of The Contract

The construction of an unambiguous contract is a matter of law for the court. *E.g., Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). When the matter can be resolved by proper construction of an unambiguous document, rendition of summary judgment is appropriate. *See, e.g., id.* Neither party claims that the Exclusive Listing Agreement is ambiguous.

The primary concern of the court is to ascertain and give effect to the intentions of the parties *as expressed in the instrument. E.g., Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex. 2005) (emphasis added). To achieve this objective, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id.* When the language is plain, the contract must be

enforced *as written.  E.g., Republic Nat'l Life Ins. Co. v. Spillars,* 368 S.W.2d 92, 94 (Tex. 1963) (emphasis added).

The operative provisions of the subject contract are clear and plain.  In the initial paragraph, TFO Realty "appoint[ed]" Mr. Smith to act as the "sole and exclusive agent" to sell the subject property.  TFO Realty "grant[ed]" Mr. Smith the "exclusive right" to sell the subject property.  In paragraph 4 of the Agreement, TFO Realty agreed to refer "***all*** inquiries and offerings received by [TFO Realty] with respect to the Premises, ***regardless of the source*** of such inquiries or offerings" to Mr. Smith as their agent.  (emphasis added).  In paragraph 5 of the Agreement, TFO Realty agreed that "[i]n the event that . . . (ii) at any time after the expiration or termination of this agreement a sale of all or any portion of the Premises, upon any terms acceptable to [TFO Realty], shall be made with ***any purchaser*** to whom the Premises were submitted ***by [Mr. Smith], or by [TFO Realty], or by any other person*** during the term of this agreement; then, and in either such event, [TFO Realty] agrees to pay to [Mr. Smith] one (1) full commission computed and payable in accordance with the applicable annexed Schedule."  (emphasis added).  The plain language of the contract is broadly worded to provide Mr. Smith with a commission "for any purchaser" (which would include governmental entities) regardless of how the purchaser is introduced to the property.

8

Further, the Schedule attached to the Exclusive Listing Agreement provides that the "commission shall be earned, due and paid in full at the time of ***the closing*** or ***transfer of title*** to the property . . . ." CR 111 (emphasis added). The TFO Realty-City of Dallas transaction closed at the title company. CR 51 (Deposition of Todd Wright, p. 30, ll. 10-12). However, even if title were transferred differently, the parties' agreement provides that a commission is still earned. The parties' clear intent was to broadly define events that would earn a commission.

B.     **The Sale to The City of Dallas**

Municipalities, such as the City of Dallas, have the authority to "acquire property . . . by gift, dedication, or purchase, ***with or without*** condemnation." TEX. LOC. GOV'T CODE §273.001. The City of Dallas, as a home rule city, has its own Charter. Therein, in Chapter II, Section 1(6), the City has the power to "acquire property . . . by ***purchase***, gift, devise, lease, or condemnation . . ." (emphasis added); *see also* Dallas City Charter Chapter II, Section 1(46) (pertaining to acquisition for utilities and containing similar language). The cited portions of the Dallas City Charter are attached in Appendix 2.

The City of Dallas exercises its powers through the City Council. Dallas City Charter Chapter III, Section 1. Thus, before the condemnation power can be exercised, it must be authorized by the Dallas City Council. *Id.*; TEX. LOC. GOV'T CODE §251.001(a); s*ee also Burch v. City of San Antonio,* 518 S.W.2d 540, 542-43

9

(Tex. 1975) (holding that only the city council of San Antonio could exercise that city's power of eminent domain).

Here, it is undisputed that the City acquired the property by deed. CR 65-70. The exercise of the condemnation power was never authorized by the Dallas City Council. Unsurprisingly, a condemnation case was also never filed. The subject acquisition was a ***purchase***, not a condemnation. A contemporaneous writing by the City of Dallas real estate group member in charge of the acquisition wrote: "I am acquiring [the subject property] amicably." CR 81. The Resolution passed by the City Council provided: "That the City Manager, and/or the City Manager's designees, is hereby authorized and directed to consummate and accept the ***purchase, grant, and conveyance*** to CITY of the PROPERTY INTEREST in and to the PROPERTY pursuant to the conveyancing instrument [attached]." CR 74 (Resolution of October 26, 2011, Section 3) (emphasis added). Under the various ways in which the City of Dallas can acquire property, this was a purchase, not a condemnation.

Now, taking the facts of this sale to the plain language of the Exclusive Listing Agreement, it is clear that this is a "sale" of a "portion of the Premises" on "terms acceptable to Owner" by "any purchaser."

TFO Realty's argument that their agreement to sell the subject property to the City of Dallas was a taking under eminent domain is legally and factually

10

inaccurate. To accept TFO Realty's position, the plain language of the Dallas City Charter providing that there are different ways in which the City may acquire property ("by purchase, gift, devise, lease, or condemnation") must be ignored. Instead, TFO Realty argues that anytime the City of Dallas acquires property it is by condemnation. TFO Realty's argument ignores the plain language of Texas Local Government Code §273.001 (municipalities may acquire property "by gift, dedication, or purchase, *with or without* condemnation"). TFO Realty's argument also ignores the requirements of the Dallas City Charter and Texas Local Government Code §251.001 that the Dallas City Council must approve the use of the City's eminent domain power.

TFO Realty's argument further ignores the plain language of the parties' agreement, the Exclusive Listing Agreement. Mr. Smith had an exclusive right to sell the property. All inquiries and offerings were to be referred to him ***regardless of source***. A commission was earned on a sale to ***any purchaser***. The parties could have agreed that sales to entities with eminent domain power would not result in a commission being due, but they did not make that agreement. They agreed that sales to ***any purchaser*** would earn a commission. Now that a commission has been earned, TFO Realty seeks to rewrite the agreement.

TFO Realty's reliance on *City of Carrollton v. Singer* is misplaced. The Fort Worth Court of Appeals in *Singer* was faced with the question of whether the City

11

of Carrollton was immune to a claim that it had failed to fulfill its obligations under a land sale contract. The holding of the Court is on page 800 of the opinion where the Court writes: "we hold that the agreement between the City and the Singers was a settlement of an eminent domain proceeding in which the Singers would have a claim against the City for adequate compensation for the City's acquisition of their property, and for which the City would not be immune." *City of Carrollton v. Singer,* 232 S.W.3d 790, 800 (Tex. App.—Fort Worth 2007, pet. denied). The *Singer* opinion does not bear upon the contractual language of the parties in this case. The *Singer* opinion does not stand for the proposition that the consensual transaction between the City of Dallas and TFO Realty was not a sale. The *Singer* opinion does not abrogate Texas Local Government Code sections 251.001(a) and 273.001 and the Dallas City Charter making clear that the City can acquire property by purchase or by condemnation. Further, the *Singer* opinion does not stand for the proposition that the City of Dallas is not within the circle of entities described by the "any purchaser" language used in the parties' Exclusive Listing Agreement. Further yet, in *Singer,* the land owner pleads and the court calls the agreement in that case a "settlement agreement." It contained obligations of the City of Carrollton beyond just paying money. The agreement in that case stands in contrast to the current matter where the transferring instrument is a standard deed. It contains no obligations to be undertaken by the City of Dallas (it

12

is premised on the purchase price having already been conveyed) and, in fact, is not even signed by the City of Dallas. The subject transaction falls squarely within the circumstance in which TFO Realty and Mr. Smith agreed a commission would be due. *Singer* is an immunity case and its result is driven by the policies applicable to application of governmental immunity. As the Court points out in its rationale for its opinion, if immunity applied to the City of Carrollton's purchase, the door is open for governmental entities to avoid paying compensation for property by entering into purchase agreements, refusing to pay, and then claiming immunity. *Id.* at 800. This is obviously an unwanted result. Also, this rationale has zero applicability to the present dispute.

TFO Realty next seeks to avoid the plain language of the parties' contract by citing extensively to the Washington Court of Appeals case of *Lundstrom, Inc. v. Nikkei Concerns, Inc.,* 758 P.2d 561 (Wash. App. 1988). However, *Lundstrom*, a case with key factual differences from the present case, does nothing to alter the plain language of the parties' agreement or Texas statutory law permitting the City of Dallas to act as a purchaser without using its eminent domain power. The key factual distinctions are these:

- The parties' contract in *Lundstrom* was a "producing cause" contract where the agent had to "<u>produce</u> a party who is ready, willing, and able to purchase …" (emphasis added). The contract at issue in this

case provides that Mr. Smith is entitled to a commission if a sale is "made with **any** purchaser to whom the Premises were submitted by Agent, or by Owner, or by any other person …" (emphasis added).

- In *Lundstrom*, the condemning authority filed condemnation proceedings. Here, no proceedings were filed and the Dallas City Council never authorized the use of the eminent domain power.

- In *Lundstrom*, the property transferred by a "Stipulation, Judgment, and Decree of Appropriation." Here, the property transferred by Deed.

- In *Lundstrom*, the Court held that the parties' agreement was "silent about a condemnation and should be construed against the drafter, Lundstrom." Here, the parties' agreement is not silent – it provides that a commission is earned on a sale to "any purchaser."

TFO Realty also relies on the Arizona case of *Mealey v. Orlich*, 585 P.2d 1233 (Ariz. 1978). In *Mealey*, the broker admitted that the language of his contract would not cover a "condemnation sale." 585 P.2d at 1234. That is not the case here. The contract between TFO Realty and Mr. Smith applies to "any purchaser."

TFO Realty also cites a California case, *Preston v. Carnation Co.,* where the property was conveyed by agreement after a condemnation case was filed and, further, where the broker failed to show that he had procured a "ready, willing, and

14

able" purchaser (a requirement of the brokerage contract at issue in that case) during the term of the broker's contract. 16 Cal. Rptr. 240, 242-43 (Cal. App. 1961). The *Preston* case is distinguishable not only because a condemnation action was filed, but also because the broker agreement at issue differed materially from the one before this Court.

The instrument of transfer in the Colorado case of *Wilson v. Frederick R. Ross Inv. Co.,* 180 P.2d 226 (Colo. 1947) is not identified in the opinion, although it is clear that the federal government took possession of property for a military arms plant and that a condemnation case was filed after the property was occupied by the government's contractor. 180 P.2d at 226. For this reason, the case is distinguishable from the present case as the seller had its property taken. It did not consensually sell to the government. However, the opinion in *Wilson* is noteworthy when it cites to U.S. Supreme Court opinions and opinions of other state courts that make clear that there is a distinction between a sale to a government entity and a condemnation by a government entity. *Id.* at 256-57 (*citing Kohl v. United States,* 91 U.S. 367, 374 (1875); *Garrison v. City of New York,* 88 U.S. 196, 204 (1874); *Tyler v. Seiler,* 136 N.Y.S. 394, 395 (N.Y. Sup. 1912)).

There are several jurisdictions that conclude that a condemnation by a governmental entity is a "sale" and does earn a broker commission when it fits

within the language of the broker's contract. *See, e.g., Sonday v. Dave Kohel Agency, Inc.,* 718 N.W.2d 631 (Wis. 2006). A catalog of decisions from other jurisdictions that reach the same resulted is also included in the *Sonday* case at pages 642-44 of that opinion. However, this Court does not need to reach a decision about whether a condemnation is a sale and, indeed, this is the wrong case in which to reach that decision. Here, no condemnation occurred. This is why TFO Realty's merits argument (as well as its argument as to why this Court should take jurisdiction over this case) fails. The argument is premised upon the fallacy that the subject property was condemned. It was not. It was sold, and it was sold by deed. It closed at a title company. It plainly fits within the language of the parties' Exclusive Listing Agreement of when a commission is earned.

TFO Realty's reliance on the LAW OF REAL ESTATE BROKERS also falls flat. The treatise does not, as TFO Realty claims, conclude that it is incumbent for a broker "to expressly *include* a taking under eminent domain as a sale." TFO Realty's Brief on the Merits p. 25 (emphasis in brief). Rather, the LAW OF REAL ESTATE BROKERS catalogs cases noting that, when "a listed property is condemned," the seller may have a defense that the broker was not a producing cause of the sale. BURKE, LAW OF REAL ESTATE BROKERS 2d ed. §3.3 at 3.37-.38 (1992 & Supp. 2007). In the contract before the court, however, Mr. Smith need not have been a producing cause of the sale. The parties could have chosen to

16

include such a requirement in their agreement. They did not. Rather, the parties' contract makes Mr. Smith the "sole and exclusive agent" and provides that he earns a commission if a purchaser buys the property to whom the property was submitted by "Agent, by Owner, or by any other person." The LAW OF REAL ESTATE BROKERS does not support re-writing the parties' contract.

Similarly, there is nothing in the Vendor and Purchaser Risk Act (TEX. PROP. CODE §5.007) that bears upon the issues before the Court. The Vendor and Purchaser Risk Act simply allocates risk between the vendor and purchaser if a condemnation interferes with passage of title between vendor and purchaser. It does not speak to the situation at bar and certainly does not rewrite the parties' agreement.

The entirety of TFO Realty's argument is premised on an assumption that the City of Dallas would have authorized condemnation of the subject tract if TFO Realty had not agreed to voluntarily sell. The assumption is flawed. If the City could not reach terms with a buyer who had a "For Sale" sign in their front yard (as TFO Realty did when the City called), no one knows whether the Dallas City Council would have authorized the use of eminent domain to acquire the tract. Indeed, the City's agent, Mr. Wright, testified that he would have had to have obtained the consent of the project engineer to even use condemnation. CR 51 (Deposition of Todd Wright, p. 32, l. 21 - p. 33, l. 10); *see also* SCR 42-43

17

(Deposition of Todd Wright, p., 45, l. 1 – p. 48, l. 3). Of course, the Dallas City Council would have also had to approve the use of condemnation. Dallas City Charter Chapter III, Section 1; TEX. LOC. GOV'T CODE §251.001(a). This never happened.

Further, even if TFO Realty had refused to sell, and even if the City had decided to exercise its eminent domain authority, the City could have also decided to take an easement under the property for the drainage project (instead of buying the property in fee simple). The bottom line is that no one knows what the City may have decided to do if the City and TFO Realty had not reached an agreement, because there was a voluntary sale and the City never had to make the decision about whether or how to use its condemnation power. Put simply, the City falls in the category of "any purchaser" and the transaction between the City and TFO Realty was a "sale."

## C.     Submitted to the City of Dallas

The Exclusive Listing Agreement provides that a commission is due for a sale occurring after the term of the agreement that is "made with any purchaser to whom the Premises were submitted by Agent, or by Owner, or by any other person . . . ." CR 108, ¶5. The term submitted is not defined in the Exclusive Listing Agreement. Thus, it is appropriate to apply its plain, ordinary, and generally accepted meaning. *Valence Operating,* 164 S.W.3d at 662. As the Dallas Court of Appeals noted in its Memorandum Opinion, an applicable definition is: "to send or commit for consideration, study, or

18

decision: refer." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2277 (1981). This provision is, of course, to be read in conjunction with the entirety of the agreement to harmonize the parties' intent. *Valence Operating,* 164 S.W.3d at 662.

The undisputed facts are that, during the term of the Exclusive Listing Agreement, the City of Dallas' agent, Mr. Wright, saw Mr. Smith's sign on the property and made inquiry. CR 35 (Affidavit of Mr. Smith ¶4). Mr. Smith promptly reported that inquiry to Ms. Owen by email the same day. *Id.* Mr. Wright, on behalf of the City, also wrote a letter to TFO Realty on July 27, 2010. CR 63. In that letter, Mr. Wright indicated that the City would be proceeding with acquisition of land for the drainage project and that a portion of the Premises would be needed. *Id.* Also, during 2010, the City had the subject property appraised. CR 35-36 (Deposition of Todd Wright p. 17, l. 15 – p. 18, l. 3).

Mr. Wright, though an agent of the City of Dallas, is not the City of Dallas itself. Mr. Wright was not the buying party. The City of Dallas was the buying party, and the City acted through its City Council to approve the purchase of property from TFO Realty. CR 88-96; *see also* Dallas City Charter Chapter III, Section 1 (all powers granted to City are exercised through City Council); *see c.f. Canales v. Laughlin,* 214 S.W.2d 451, 456 (Tex. 1948) (holding that even individual members of a governing body can not bind the body politic; it must be the governing body acting as a body).

The subject property was submitted to the City of Dallas in at least three ways during the term of the Exclusive Listing Agreement: (i) Mr. Wright saw Mr. Smith's sign and then called Mr. Smith to make inquiry about the property; (ii) Mr. Wright wrote a letter expressing the City's interest in the property; and (iii) the City's appraiser

19

prepared an appraisal report of the property. This process is like numerous other real estate deals. A potential buyer starts looking for property and is made aware of a property through marketing material (here, a real estate sign) or otherwise. The potential buyer makes contact with the broker. The potential buyer later expresses further interest in buying the property (here, via letter from Mr. Wright) and does due diligence on the property. The process in this transaction plainly falls within the scope of the parties' agreement about when a commission would be earned.

TFO Realty's argument, one cannot submit property to itself, completely ignores the clear intent of the parties as expressed in the Exclusive Listing Agreement – to broadly define the circumstance under which the real estate broker would earn a commission. Here, the property could be submitted "by any other person" and the commission would still be earned. The parties' intent to broadly define the submission process is patent. TFO Realty continues to try to interject a "procuring cause" provision into the Exclusive Listing Agreement that simply does not exist (and, in fact, is contrary to the clear and expressed intent of the agreement). Further, TFO Realty's argument adds a phrase to the contract that is not there: namely, that a buyer cannot submit property to itself. The property was submitted to the City of Dallas by, at least, Mr. Smith, Mr. Wright, and the City of Dallas' appraiser.

## CONCLUSION

For the foregoing reasons, there is no good reason for this Court to grant review of this case of contract interpretation. Not only is there no conflict among the courts of appeals requiring correction, the trial court's and the Dallas Court of

20

Appeals' contract interpretation is correct. Respondent Mr. Smith prays that the Court deny TFO Realty's Petition for Review.

Respectfully submitted,

Locke Lord LLP

/s/ Clint Schumacher
Clint Schumacher
  Texas Bar No. 24002914
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8587 – Telephone
(214) 740-8800 – Facsimile
jschumacher@lockelord.com

**ATTORNEYS FOR RESPONDENT
PHILIP S. SMITH**

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Tex. R. App. P. 9.4(i)(3), that this Respondent's Brief on the Merits contains 5,072 words, according to the word count feature of Microsoft Word, excluding those items properly excluded under Tex. R. App. P. 9.4(i)(1).

/s/ Clint Schumacher
Clint Schumacher

22

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2015, a true and correct copy of the foregoing Respondent's Brief on the Merits has been sent to the Court and to counsel via electronic filing per local Rule 3.A.a., and has been sent via certified mail, return receipt requested, to counsel of record as follows:

B. Prater Monning III
Wynne & Wynne
137 W. James St.
Wills Point, TX 75169

/s/ Clint Schumacher
Clint Schumacher

# APPENDIX 1

# EXCLUSIVE LISTING AGREEMENT

December 11, 2001

Philip S. Smith
Philip S. Smith & Co.
1901 N. Akard
Dallas, Texas 75201

Re:  Approximately 1.34 acres of land, comprised of two tracts, Tract 1 being a ground lease with Comerica Bank of approximately 23,000 square feet, and Tract 2 being the adjacent undeveloped parcel, containing approximately 35,503 square feet, further described on the attached Exhibit "A", and referenced in this agreement as, ("the Premises").

Dear Phil:

TFO Realty, LLC, a Texas limited liability company (hereinafter "Owner") hereby appoints Philip S. Smith (hereinafter referred to as "Agent") as Owner's sole and exclusive agent and grant to Philip S. Smith the exclusive right to sell all or any portion of the Premises.

Agent's appointment as sole and exclusive agent shall be upon the following terms and conditions:

1. The term of this agreement shall commence on the date hereof and continue in effect until December 31, 2002.

2. Agent agrees that it will enlist its best efforts to secure a satisfactory purchaser(s) for the Premises and if Agent deems it necessary, will also solicit the cooperation of other licensed real estate brokers.

3. If it is mutually deemed desirable, Agent shall advertise the Premises or portions thereof, prepare signs, site plans, plats, marketing materials and brochures, aerials, web sites and/or other forms of advertising, subject to Owner's approval and at our expense. All advertising whether prepared or issued by Agent or by Owner shall identify Philip S. Smith as exclusive Agent for the Premises.

4. During the term of this agreement, Owner will refer to Agent all inquiries and offerings received by Owner with respect to the Premises, regardless of the source of such inquiries or offerings, and all negotiations shall be conducted



**EXHIBIT**

**A**



EXHIBIT

/



EXHIBIT

solely by Agent or under Agent's direction, subject to Owner's review and final approval.

5. In the event that: (i) at any time during the term of this agreement a sale and/or joint venture of all or any portion of the Premises, upon any terms acceptable to Owner, shall be made with any purchaser, or developer in the event of a joint venture, who was procured by Agent, or by Owner, or by any other person; or (ii) at any time after the expiration or termination of this agreement a sale of all or any portion of the Premises, upon any terms acceptable to Owner, shall be made with any purchaser to whom the Premises were submitted by Agent, or by Owner, or by any other person during the term of this agreement; then, and in either such event, Owner agrees to pay to Agent one (1) full commission computed and payable in accordance with the applicable annexed Schedule. All such commissions shall be payable to Philip S. Smith. Periodically during the term of this agreement and immediately upon termination of the agreement, Agent shall furnish Owner with a written listing of all potential purchasers, developers or others to whom Agent has shown the Premises.

6. If a licensed real estate broker other than Agent is the effective procuring cause of any sale covered by this agreement, Agent shall use its best efforts to have such other broker agree to be paid a fee by their client and if not, then to accept, as its compensation an equitable portion of the commission payable to Agent pursuant to this agreement, and if such other broker so agrees, Owner will pay to Agent the commission set forth above out of which Agent will pay to such other broker its agreed upon share and retain the balance of the commission as Agent's compensation. In no event shall Agent be liable for the failure to obtain such other broker's agreement to accept, as its compensation, an equitable portion of the commission payable to Agent hereunder.

7. (a) Owner acknowledges that Agent may represent potential Tenants or Purchasers and Owner hereby consents to such intermediary representation. As a real estate broker who acts as an intermediary in a transaction, Agent (i) shall treat all parties honestly; (ii) may not disclose that the Owner or Landlord will accept a price or lease consideration less than the asking price or lease consideration unless authorized in writing to do so by the Owner or Landlord; (iii) may not disclose that the buyer or tenant will pay a price or lease consideration greater than the price or lease consideration submitted unless authorized in writing to do so by the buyer or tenant; and (iv) may not disclose any confidential information or any information that a party specifically instructs Agent in writing not to disclose unless authorized in writing to disclose the information or required to do so by the Texas Real Estate Act or by a court order or if the information materially relates to the condition of the property.

(b) The parties hereto acknowledge that Agent may represent other owners of property located in an area bounded by Leonard Street, Colby Street, Maple-Routh Connection and Woodall Rodgers Freeway and that such representation may result in Agent having a conflict of interests with respect to its representation of multiple owners. If Agent represents such owners, Agent agrees to enter into agency agreements identical to this agreement with such other owners and to fully disclose Agent's representation Of Owner and any other such owners in the aforementioned area. Further, Agent agrees to disclose to Owner any purchase or joint venture offers received by such other owners during the term of this agreement. Agent may also disclose to such other owners any purchase or joint venture offers received by Owner during the term of this agreement. The parties hereto agree to use good faith efforts to resolve any conflicts of interest, which may arise as a result of Agent representing Owner and any such other owners of property in the aforementioned area.

8. Owner hereby confirms to you the information appearing on the Property Information Report annexed hereto.

9. This agency shall be binding upon the parties hereto, their respective successors and assigns.

If the foregoing accurately sets forth our agreement, please sign and return the enclosed copies of this letter.

Very truly yours,

TFO Realty, LLC, Owner and/or Landlord

By: _____ 1-04-02
Traci F. Owen, Sole Member/Manager
5949 Sherry Lane
Suite 1025, LB - 180
Dallas, Texas 75225

AGREED AND ACCEPTED:
PHILIP S. SMITH

By: _____
Date: 1/7/2002

Attachment

# PROPERTY INFORMATION REPORT

This Property Information Report is attached to and made a part of the Agreement, dated as of December 11, 2001, between Phillip S. Smith, Agent and TFO Realty, LLC, Owner, relating to certain real estate commonly known as the a 1.34 acres tract of land, further described in Exhibit A, ("the Premises").

Owner hereby advises Agent as follows with respect to its knowledge of the presence of the substances and/or items listed below in, on or about the Property.

| Item | No Knowledge | Not Present | Present | Location |
|---|---|---|---|---|
| Asbestos | X | | | |
| Chemical | X | | | |
| Lead Based | X | | | |
| Paints | X | | | |
| Radon Gas | X | | | |
| PCB'S | X | | | |
| Underground Storage Tanks | X | | | |
| Other, Toxic, Hazardous or Contaminated | X | | | |
| Substances. | X | | | |

Owner agrees to disclose to Agent and all prospective purchasers all information in its possession regarding the presence at the Property of the substances or items listed above, to make available to Agent and all prospective purchasers all inspection reports pertaining to the presence of such substances or items and that Agent is hereby authorized to disclose to any prospective tenants or purchasers any information regarding the presence of such substances or items.

# SCHEDULE OF COMMISSIONS

## 1. RATES

Five percent (5%) of the total sales price, or in the event of a joint venture, then five percent (5%) of the land value or equity contributed to a joint venture.

## 2. TIME OF PAYMENT

The commission shall be earned, due and paid in full at the time of the closing or transfer of title to the property, except, in the case of an installment purchase contract, in which case, the commission shall be earned, due and paid in full at the time of the execution and delivery of the installment purchase contract by and between the seller and the purchaser.

## 3. COMPUTATION OF THE SALES PRICE

The Commission shall be computed in accordance with the above rate based upon the total sales price, which shall include any mortgages, loans or other obligations of the seller which may be assumed by the purchaser or which the purchaser takes title "subject to", any purchase money loans or mortgages taken back by the seller, the sales price of any fixtures or other personal property sold by separate agreement between the seller and the purchaser as part of the overall sale of real property, and the current market value of any other real or personal property transferred from the purchaser to the seller.

## 4. MISCELLANEOUS

The terms "Seller" and "Purchaser" shall be deemed to include any subsidiaries, affiliates, successors, assigns and nominees of same.

In the event either party shall commence litigation against the other party to enforce its rights under this agreement and/or schedule, the party prevailing in such litigation shall be entitled to recover from the other party its reasonable attorney's fees and disbursements thereby incurred.

<u>Seller's initials</u>



# APPENDIX 2

# CHARTER


## city of


## DALLAS, TEXAS




CITY OF DALLAS


April 2006 Printing

## CHAPTER I.  INCORPORATION AND TERRITORY

### SEC. 1.        CORPORATION NAME.

All inhabitants of the City of Dallas, Dallas County, Texas, as the boundaries and limits of said city are herein established or may hereafter be established, shall be a body politic, incorporated under, and to be known by, the name and style of the "City of Dallas," with such powers, rights and duties as herein provided.

### SEC. 2.        BOUNDARIES.

The bounds and limits of the City of Dallas shall be those as established and described in ordinances duly passed by the city council of the City of Dallas in accordance with state law. The city secretary shall at all times keep a correct and complete description with recent annexations or disannexations.  (Amend. of 6-12-73, Prop. No. 1; Amend. of 4-2-83, Prop. No. 3)

### SEC. 3.    ADDITIONAL TERRITORY.

The city may from time to time alter its boundaries by annexing or disannexing any territory adjoining its present or future boundaries in any size or shape desired in any manner provided by state law.  (Amend. of 11-8-05, Prop. No. 12)

## CHAPTER II.  POWERS OF CITY

### SEC. 1.        POWERS OF THE CITY.

The City of Dallas, as such body politic and corporate, shall have perpetual succession and shall have the following powers:

> (1)      To use a corporate seal.
>
> (2)      To sue and be sued.

(3)     To implead and be impleaded in all courts.

(4)     To institute and prosecute suits without giving security therefor, and to appeal from judgments of the courts without giving supersedeas or cost bonds, other bonds or security.

(5)     To contract and be contracted with.

(6)     To acquire property within or without its boundaries or within the boundaries of other municipalities for any public purpose, in fee simple or lesser interest or estate, by purchase, gift, devise, lease, or condemnation; to sell, rent, lease, hold, manage, and control any property now owned by it or that it hereafter may acquire; and to construct, own, lease, operate, and regulate public utilities.

(7)     To assess, levy, and collect taxes for general and special purposes on all lawful subjects of taxation.

(8)     To borrow money on the faith and credit of the city by the issue or sale of bonds, warrants, or notes of the city.

(9)     To appropriate the money of the city for all lawful purposes.

(10)     To create, provide for, construct, regulate, and maintain public works and public improvements of any nature.

(11)     To levy and collect assessments for local improvements.

(12)     To levy an occupation tax on any person, occupation, calling, or business where permitted under the laws of this state.

(13)     To license and regulate vehicles operated for hire and fix and regulate the rates to be charged for the use of such vehicles.

(14)     To license and regulate persons, corporations, and associations engaged in any business, occupation, profession, or trade.

(15)     To license and regulate all places of public amusement.

(41)     To contract with public service carriers, common carriers, or private carriers or with transportation authorities for the furnishing of transportation facilities within the city limits of Dallas and connecting the adjoining areas; including the joint use of publicly owned and privately owned or joint publicly owned facilities to provide an interregional transportation network, both within and without the city limits of Dallas.

(42)     To require any and all railroad companies operating any track upon or across any public street of the city, to reduce any such track below the level of the streets intersected or occupied by any such track, or to elevate any such track above the level of the streets intersected or occupied by any such track, and to require the company or companies owning or operating any such track to provide necessary and proper crossing for the public travel at intersecting streets; all such work to be done in the manner required by the city.

(43)     To require any holder of a franchise from the city to allow the use of its tracks, poles, underground conduits and wires by any other holder to which the city shall grant a franchise upon payment of a reasonable rental therefor to be fixed by the city council.

(44)     To exercise any of its powers or perform any of its functions and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with the State of Texas, any county of this state or any of the civil agencies thereof which have any of the municipal powers, or the United States or any agency thereof.

(45)     To acquire, construct, or own, within or without the city, either wholly or in cooperation with any other city, county or political subdivision of the state, an airport or airports, either by purchase, donation, bequest, eminent domain or otherwise; to provide for the operation, maintenance, control and financing thereof, the same as though wholly owned by the city within its city limits.

(46)     To acquire, by purchase, gift or devise, or by the exercise of the right of eminent domain by and through condemnation proceedings, and own, in fee simple or otherwise, either public or private property located inside or outside of the corporate limits of the city or within any county in the state, for the extension, improvement and enlargement of its waterworks system, including riparian rights, water supply reservoirs, standpipes, watersheds, dams, the laying, building, maintenance and construction of water mains, rights-of-way in connection therewith, and the laying, erection, establishment or maintenance of any necessary appurtenances or facilities which will furnish to the inhabitants of the city an abundant supply of wholesome water; for sewerage plants and systems; rights-of-way for water and sewer lines; parks, playgrounds, fire-rescue stations, police stations, airports and landing fields, burial grounds and cemeteries, incinerators or other garbage disposal plants, electric light and power plants and rights-of-way for lines in connection therewith, gas plants and rights-of-way for gas lines in

connection therewith; streets, boulevards and alleys or other public ways; city jails, prison farms, city halls and other municipal buildings, municipal garages, and parking facilities, or any rights-of-way needed in connection with any property used for any purpose hereinabove named; for the straightening or improving of the channel of any stream, branch or drain and for any other municipal purpose.  The procedure to be followed in any condemnation proceedings hereunder and authorized herein shall be in accordance with the provisions of the state law with reference to eminent domain.  The provisions of Title 52 of the Revised Civil Statutes of Texas (1925), as amended, or as may hereafter be amended, shall apply to such proceedings, or such proceedings may be under any other state law now in existence or that hereafter may be passed governing and relating to the condemnation of land for public purposes by a city.

(47)    To exercise all the powers conferred upon water improvement districts or water control and preservation districts under the state law as the same now exists or may hereafter be amended, providing for the exercise of the rights of eminent domain by and through condemnation proceedings.  It shall also have all the powers authorized by Article 7880-126, Revised Civil Statutes of the State of Texas, as the same presently exists or may hereafter be amended, and all other powers conferred upon cities and towns in the State of Texas acting individually or jointly, in the furnishing of an adequate supply of wholesome water.  It shall have authority to sell any surplus water not needed by the City of Dallas.

(48)    To erect and establish work houses, houses of correction, or rehabilitation facilities within or without the city limits; to make all necessary rules and regulations therefor; to employ personnel necessary to manage and control the same; to assign persons confined to the city jail to any such facility so established.

(49)    To provide a code of ethics by ordinance which shall be binding on all officers, employees, and elective and appointive officials as provided herein, setting out the acts, conduct and financial interest which shall be considered to be in conflict with the position they hold and providing the procedure for enforcing the same.  This may be either in addition to, or incorporated into personnel rules and regulations as pertain to various employees.

(50)    To adopt rules and regulations regarding campaign contributions and expenditures for city elections.

(51)    To adopt a disaster emergency preparedness ordinance that provides for the development and adoption of a comprehensive city emergency management plan, to take effect in the event of the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural or man-made cause. The comprehensive city emergency management plan must ensure the continuity of governance. (Amend. of 5-3-97, Prop. No. 6; Amend. of 11-8-05, Prop. Nos. 4, 6, and 10)

**SEC. 2. GENERAL POWERS ADOPTED.**

The enumeration of particular powers in the Charter shall not be held or deemed to be exclusive, but in addition to the powers enumerated herein, implied thereby or appropriate to the exercise thereof, the city shall have and may exercise all other powers which under the Constitution and laws of the State of Texas, it would be competent for the Charter specifically to enumerate. The city shall have and exercise all the powers conferred upon cities by what is known as the Home Rule Amendment to the Constitution of the State of Texas and the Enabling Act relative thereto, passed by the Thirty-third Legislature of the State of Texas, found in the published laws of said legislature, Regular Session, pages 307 to 317, and effective July 7, 1913, and all other laws passed by the legislature of the State of Texas, relating thereto, or which may hereafter be passed by said legislature in relation to such matters.

**SEC. 3. CHARTER REVIEW PROCESS.**

At intervals of not more than 10 years (the first interval to occur not more than 10 years after adoption of this section), the Charter shall be reviewed by a commission appointed by the council. The commission shall complete the review and report to the council within one year after its appointment. Notwithstanding this section, amendments to the Charter may at any time be framed and proposed as provided by law. (Amend. of 11-8-05, Prop. No. 7)

## CHAPTER III. CITY COUNCIL

**SEC. 1. COMPOSITION OF CITY COUNCIL.**

Except as otherwise provided by this Charter, all powers conferred on the city shall be exercised by a city council to be composed of 15 members, nominated and elected in the manner hereinafter provided unless otherwise provided by law. One member of the city council, Place 15, shall be elected by the qualified voters of the entire city and 14 members by the qualified voters residing in a particular district, Places 1 through 14 respectively, as provided in Chapter IV of this Charter. Members of council, Places 1 through 14, shall each be elected for a term of two years and member of council, Place 15, shall be elected for a term of four years. The city council members so elected shall take office on the first Monday following the 30th calendar day after the final canvass of the general election, and they shall serve until their respective successors have been elected and qualified. (Amend. of 4-3-76, Prop. No. 1; Amend. of 8-12-89, Prop. No. 1; Amend. of 5-1-93, Prop. No. 1; Amend. of 5-3-97, Prop. No. 7; Amend. of 11-8-05, Prop. No. 6)